NATIONAL COAL
ASSOCIATION, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

No. 85-2262.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 10, 1986.

Decided Jan. 30, 1987.

Rehearing and Rehearing En Banc
Denied March 11, 1987.

Michael B. Barr (Kristy A. Niehaus; Hunton & Williams, Washington, D.C., on brief), for petitioner.

Joseph Freedman, Office of Gen. Counsel, U.S.E.P.A. (Francis S. Blake, Gen. Counsel; Susan G. Lepow, Acting Associate Gen. Counsel; F. Henry Habicht, II, Asst. Atty. Gen., Land & Natural Resources Div.; Susan L. Smith, Joseph Freedman, Washington, D.C. on brief), for respondent.

Before RUSSELL and HALL, Circuit Judges, and DOUMAR, United States District Judge for the Eastern District of Virginia, sitting by designation.

K.K. HALL, Circuit Judge:

National Coal Association ("NCA") petitions the Court pursuant to § 509(b)(1) of the Clean Water Act, 33 U.S.C. § 1369(b)(1) (1982), for review of the effluent limitation guidelines promulgated by the Administrator of the United States Environmental Protection Agency ("EPA") at 50 Fed.Reg. 41,295, *et seq.* (1985) (codified at 40 C.F.R. Part 434). In particular, NCA challenges as arbitrary and capricious the EPA's revision of its effluent limitation guidelines and standards for settleable solids [1] for the coal mining industry from a "daily maximum" to a "maximum not to be exceeded" of 0.5 milliliter per liter (ml/L). The practical effect of this change is to require the coal mining industry to adhere to a numerical settleable solid effluent limitation in each sample taken during a given day. The previously promulgated limitation could be met if after an averaging of the samples taken for that day, the resulting settleable solid content did not exceed the 0.5 ml/L limitation. We conclude that the change was not arbitrary and capricious, and we, therefore, affirm.

I.

In 1977 and 1979, EPA promulgated regulations which placed limits on the volume of discharges of sediment into coal mining wastewater. These regulations reflected the degree of pollutant reduction attainable by dischargers, applying the technology identified by EPA as the "best practical control technology currently available"

1. "Total suspended solids" are defined to include all solid substances found in the effluent including iron, manganese and sediment. "Settleable solids" are the subset of total suspended solids which will settle to the bottom of a one-li-

ter cone within one hour and comprise particles of larger grain size. (o.4 millimeter or more). 46 Fed.Reg. 3144 (1981) (codified at 40 C.F.R. §§ 434.11, 434.64).

("BPT") for the industry category or sub-category. Also, the regulations reflected the degree of pollutant effluent attainable by coal companies just entering business, otherwise known as new source performance standards ("NSPS") based upon the best available demonstrated control technology.[2]

The 1977 regulations included a storm exemption from the limitation on settleable solids for coal mining operations that designed, constructed and maintained a sedimentation pond to contain the runoff from a 10–year, 24–hour rainfall.[3] This storm exemption was created because EPA determined that the limits placed on the volume of sediments discharged could not be met during periods of extremely heavy precipitation. In 1979, the EPA determined that the limits were not achievable in either BPT or NSPS conditions even during storm events of lesser magnitude. Therefore, pending further study, EPA revised the storm exemption to apply to any discharge caused by rainfall or snowmelt, so long as the discharger had a sediment pond designed, constructed and maintained to contain the runoff from a 10–year, 24–hour storm event.[4]

Thereafter, EPA began a study to determine what numerical limitations, if any, could be attained during storm periods which did not exceed a 10–year, 24–hour event. Samples of wastewater were taken from twenty-three 10–year, 24–hour ponds by coal company employees. The companies were instructed to take samples once a week during dry periods, and twice a day during rain and on the day following rain.

The coal operators were able to take samples at any moment during the day that they chose.

EPA and its contractor, Radian Corporation, analyzed the data taken during wet conditions to determine an appropriate settleable solids limitation which could be met 99% of the time. The results indicated that none of the samples taken from perfectly operated ponds contained a settleable solid content in excess of 0.5 ml/L at any time during the study. Of the well-operated but smaller than optimal 10–year, 24–hour ponds, 98.5% of the samples contained settleable solids of 0.5 ml/L or less. Finally, of all of the ponds tested, including those clearly not properly operated, 95% of the samples taken contained settleable solids of 0.5 ml/L or less. EPA thus concluded that 0.5 ml/L was an achievable "daily maximum" limitation based on the technology of the already mandatory 10–year, 24–hour sedimentation pond. However, the research indicated that smaller ponds could also achieve the limitation, thereby avoiding expensive expansion costs.

Based upon this study, in 1982, EPA published final guidelines setting a "daily maximum" effluent limitation for wastestreams.[5] The Commonwealth of Pennsylvania and the West Virginia Mountain Stream Monitors, Inc. filed petitions to review the regulations in this Court. After extensive negotiations, petitioners and EPA entered into a settlement agreement, pursuant to which EPA agreed to revise those regulations. *National Coal Association v. United States Environmental Protection Agency*, 82–1929. One of EPA's

---

**2.** 42 Fed.Reg. 21,380 (1977) (codified at 40 C.F.R. § 434.22) set the effluent limitations based upon BPT conditions, and 44 Fed.Reg. 2586 (1979) (codified at 40 C.F.R. § 434.25) established the limits in NSPS conditions. Both provisions controlled discharges of sediment as well as ph, iron, and manganese through limits on total suspended solids. This case, however, concerns the limitations later placed on settleable solids, a subset of total settleable solids.

**3.** A 10–year, 24–hour rainfall is defined in 50 Fed.Reg. 41,306 (1985) (codified at 40 C.F.R. § 434.11(n)) as "the maximum 24–hour precipitation event with a probable recurrence inter-

val of once in ... ten years ... as defined by the National Weather Service and Technical Paper No. 40, 'Rainfall Frequency Atlas of the U.S.,' May 1961, or equivalent regional or rainfall probability information developed therefrom." The 10–year, 24–hour pond operates as a sifter to retain settleable solids inside the pond which otherwise would flow into the surrounding area.

**4.** 44 Fed.Reg. 76,788 (1979).

**5.** 47 Fed.Reg. 45,382 (1982) (codified at 40 C.F.R. § 434.63).

eventual changes was to replace the language construing the effluent limitation as a "daily maximum" with language describing it as a "maximum not to be exceeded." EPA claimed that it had intended for the 0.5 ml/L to be an instantaneous maximum [6] and that the implementation of this standard was supported by the study. On October 9, 1985, the new guidelines which incorporated the instantaneous maximum settleable solids limitation was issued over NCA's objections.[7] Thereafter, NCA filed a petition to review EPA's regulations in this Court.

## II.

NCA contends on appeal that EPA's study results do not support a determination that the 0.5 ml/L limitation on settleable solids can be met as an instantaneous maximum. According to NCA, the study was inconclusive because EPA cannot demonstrate unequivocally that the research data base included samples taken during "peak flow." "Peak flow," according to NCA, is the point during which the most settleable solids are present in the effluent. Therefore, appellant concludes that the modification of the regulations, based on this study, is arbitrary.

NCA further contends that the inconclusive character of the data base can be avoided if the former regulations, which treated the limitation as a "daily maximum," are reinstated. NCA notes that the former regulation required only that the *average* of all samples taken during a given day not exceed the 0.5 ml/L limitation. According to the appellant, because during the study, coal operators were permitted to take the samples at their convenience, they likely would have taken them when conditions were mild, rather than during peak flow. We are not persuaded by NCA's arguments.

The coal operators were informed that the data was being collected to aid in developing regulations that would apply to them, thereby creating every incentive for the operators to obtain their samples at times when they believed that settleable solids levels would be at their highest.

Moreover, we note that NCA fails to suggest a sampling method which would have conclusively included peak flows. Although we suspect that peak flow would logically often occur during heavy rainfall, the precise point of peak flow cannot be estimated. The only way to ensure that samples of peak flow are included would be to take continuous samples daily, one after another—a burdensome if not impossible task. We find that the study, which concluded that the 0.5 ml/L settleable solids limitation could be met as an instantaneous maximum, was performed in a reasonable fashion, and that the chances of excluding peak flow in its data base were very low.

## III.

Accordingly, for the foregoing reasons, we conclude that the modified regulations promulgated by EPA, are neither arbitrary nor capricious and are supported by the study upon which they were based.

AFFIRMED.

---

**6.** The parties refer to the term "instantaneous maximum" to describe a limit that is never to be exceeded.

**7.** 50 Fed.Reg. 41,295, *et seq.* (1985) (codified at 40 C.F.R. Part 434).